HOUSTON OIL CO. OF TEXAS et al. v. VOTAW. (No. 72.)*

(Court of Civil Appeals of Texas. Beaumont. Feb. 17, 1916. Rehearing Denied March 23, 1916.)

1. PUBLIC LANDS ⊕⇒177—RESULTING TRUST —SCHOOL LANDS.

Where plaintiff, under Rev. St. 1895, arts. 4218j, 4218k, made application to purchase public land, and made oath that he was not purchasing for any other person, and entered into an obligation for the deferred payments, and received a patent reciting purchase and full payment, no trust would arise in favor of one who paid the purchase price, since such result would be a fraud on the state, and since no resulting trust can spring from an act contrary to public policy or to statute.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 576–578; Dec. Dig. ⊕⇒177.]

2. PUBLIC LANDS ⊕⇒177—RESULTING TRUST —EVIDENCE.

In trespass to try title to land patented to plaintiff and for damages for cutting timber, where defendants claimed under deeds from one alleged to have paid the purchase price, evidence as to whose money was used in the purchase *held* not so clear and satisfactory as to show any resulting trust in the defendants' grantor.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 576–578; Dec. Dig. ⊕⇒177.]

Appeal from District Court, Hardin County; J. Llewellyn, Judge.

Trespass to try title by J. N. Votaw against the Houston Oil Company of Texas and others. Judgment for plaintiff, and defendants appeal. Affirmed.

---

H. O. Head, of Sherman, and Parker & Kennerly, of Houston, for appellants. J. F. Lanier and W. D. Gordon, both of Beaumont, for appellee.

BROOKE, J. This is a suit in trespass to try title for H. T. & B. section 4 and H. & T. C. section 224, in Hardin county, Tex., and for damages for timber cut and removed therefrom, brought in the district court of Hardin county, Tex., by appellee, J. N. Votaw, against the appellants, Houston Oil Company of Texas, Kirby Lumber Company, and Maryland Trust Company. Two suits were originally filed, one involving H. T. & B. section 4, and the other involving H. & T. C. section 224, in the Ninth district court, but afterwards consolidated by agreement, and transferred to the Seventy-Fifth district court. Appellants filed plea of not guilty and general denial of the allegations of damages for timber cut and removed. W. D. Gordon, of Jefferson county, intervened, claiming an interest in both the land and the claim for damages for timber cut, but this intervention was dismissed by the intervener. The case was tried before the court without a jury, resulting in judgment in favor of appellee against all of the appellants for the two sections of land, and against Houston Oil Company of Texas and Kirby Lumber Company for damages in the sum of $8,183.70, as the value of the timber cut therefrom. Appellants filed in due time formal motion for new trial, and afterwards amended motion for new trial, which were overruled, exception saved, and notice of appeal given in open court. Supersedeas bond was filed in due time, and this appeal perfected.

The district judge found the timber had been cut in good faith, and with the belief that title was in appellants, and therefore found against appellee on the issue of appellants' liability for the manufactured value of the timber cut, and found for appellee the reasonable market value of such timber. Appellee is complaining of this by cross-assignment.

Appellee offered in evidence certified copy of patent from the state of Texas to J. N. Votaw, assignee of J. B. Wallace, of date March 7, 1912, covering the following described land: 640 acres in Hardin county, known as section 4, H. & T. B. R. R. Co. certificate No. 561, on the headwaters of Pine Island Bayou, a tributary of Neches river, about 12 miles south 82° west from Kountze, said land having been purchased and fully paid for in accordance with an act of 1895 (Acts 24th Leg. c. 47) and the amendment thereto by the act of May 19, 1897 (Acts 25th Leg. c. 129) (describing the land). The above patent was recorded on the 23d day of October on volume 60, page 97, Deed Records of Hardin County, Tex.

Plaintiff offered and read in evidence certified copy of patent from the state of Texas to J. N. Votaw, of date May 7, 1902, for the following described land: 640 acres of land, situated and described as follows: In Hardin county, known as section No. 224, H. & T. C. R. R. Co. certificate No. 508 on the waters of Cypress creek, a tributary of Big Sandy creek, about 16 miles N. 68° W. from Kountze, said land having been purchased and fully paid for in accordance with an act of 1895 and the amendment thereto by the act of May 19, 1897 (setting out the description). The above patent was recorded on the 23d day of October, 1914, in volume 65, page 98, of the Deed Records of Hardin County, Tex.

The following agreement was entered into by counsel: It is agreed that between the 1st of August, 1913, and the last day of December, 1913, that the Kirby Lumber Company cut from H. & T. C. section No. 224 in Hardin county, Texas, under the contract between the Kirby Lumber Company and the Houston Oil Company, 2,950,926 feet of pine timber. It is also agreed that in September, 1912, the Kirby Lumber Company cut from section 4, H. & T. B., 238 ties, which they purchased from the Houston Oil Company, of the value of and for which they paid the Houston Oil Company $22.88.

Plaintiff rested, and the depositions of Clark M. Votaw were offered in evidence. It is necessary that this testimony be set out practically in full, same being as follows:

"My name is Clark M. Votaw; age, 44; residence, Dominican Republic, West Indies. I am a son of J. N. Votaw, the plaintiff in this cause. I have been a resident of the state of Texas from some time in the year 1875 up to and including the early part of the year 1907. My business during said years and since has always been connected with the timber and lumber business, and during the years 1898, 1899, 1900, 1901, 1902, 1903, and a portion of 1904 I was employed by Mr. John H. Kirby and some of his allied interests. My duties in connection with said employment were with reference to handling and looking after his lands. I am acquainted with John H. Kirby of Houston, Harris county, Tex., and have been acquainted with him a little over 20 years. Yes, sir; I had business relations with John H. Kirby during the years 1898, 1899, 1900, 1901, 1902, 1903, and a portion of 1904; my relations and duties being the purchase of lands and the handling of the same after purchase, and generally my duties were in connection with Mr. Kirby's large landholdings in Hardin and other counties in East Texas.

"During the latter part of the year 1899, or the early part of the year 1900 I was employed by Mr. Kirby in the manner described in my preceding answer. The general terms of my employment and business relations with Mr. Kirby were that I was to purchase and handle his large landholdings, and the details and terms of my employment and arrangement with him were to the effect that he paid me a salary for my time, and when I made a certain class of extra good and cheap purchases of land he divided with me the profits of such transactions. There never was any written contract between us as to the division of such profits; each transaction standing on its own basis. Purchases made by me for Mr. Kirby in the ordinary run of business and

at current prices I did not participate in any of the profits thereof, but, as above stated, when some extraordinary bargains were made, he often gave me a portion of the profits, and said arrangements began in, as I have previously stated, some time about the year 1898, and terminated some time in the year 1904.

"Yes; during the period embraced in the years 1898, 1899, 1900, 1901, 1902, 1903, and a portion of 1904 I was engaged in the purchase of lands in Hardin county, Tex., for Mr. John H. Kirby. During such period I also purchased on my own account quite a few tracts of land. The details and arrangements between myself and Mr. Kirby for the purchase of said lands have been fully set out in my answer to the preceding interrogatory, No. 7.

"During the years 1898, 1899, 1900, 1901, 1902, 1903, and a portion of 1904 I had arrangements with Mr. Kirby by which I purchased for his account many tracts of land in Hardin and other counties in the state of Texas, the general terms of which said acquisitions were made with the funds of and for the account of Mr. Kirby; but, as I have stated in a previous answer, in some exceptional cases Mr. Kirby allowed me to participate in the profits derived from purchases.

"I paid money for all lands purchased in Hardin and other counties in Texas. Said money was furnished to me by Mr. John H. Kirby as in each case was required by the terms of the transaction in question.

"It was our custom, in order to keep prices from going skyward, to take all original purchases in the names of persons other than John H. Kirby, and for that reason purchases were made in the name principally of Charles G. Bruce. However, a number of titles were taken in the names of Messrs. E. J. Eyres, J. N. Votaw, W. W. Willson, and others, whose names I do not now recall, but which will be abundantly shown by reference to the records of Hardin and other counties in Texas, but in all such purchases the title was taken for the benefit of John H. Kirby, and sooner or later were all transferred either to him or to some other person or company designated by him; Mr. Kirby being in each and every case the actual owner and the real party in interest.

"During the period of time embraced within the years 1898, 1899, 1900, 1901, 1902, 1903, and a portion of 1904 I remember of purchasing a number of tracts of land in the name of J. N. Votaw for Mr. John H. Kirby. I would not attempt to give a complete list of such purchases. I do remember, however, that there were purchased within said period of time H. T. & B. R. R. Co. section No. 4, in Hardin county, Tex., and also Il. & T. C. Ry. Co. section No. 224, situated also in Hardin county, Tex., and a portion of the Napoleon De Waltz survey of land, situated in Hardin or Liberty counties. There were other purchases of land also embraced under the same condition, the names of which I cannot now recall. The H. T. & B. section above mentioned was purchased from one J. B. Wallace, and the H. & T. C. Ry. Co. section No. 224 was purchased from the state of Texas, and the Napoleon De Waltz survey was purchased from some owner whom I do not now remember, but the records should fully show, and in all instances above mentioned the purchase money was paid by Mr. John H. Kirby, and said purchases made for his benefit, and in the three instances above specifically set forth title was taken in the name of Mr. John H. Votaw for the benefit of Mr. John H. Kirby.

"I know one J. B. Wallace. I knew him covering a period of about five or six years beginning with about the year 1895 up to the time of his death, which occurred some time about the year 1901.

"Some time during the latter part of the year 1899 I began to negotiate with J. B. Wallace for the purchase of H. T. & B. section No. 4

in Hardin county, and finally consummated the purchase thereof, with the assistance of Mr. W. W. Dies, of Hardin county, paying to Mr. Wallace something over $1 per acre for his equity therein (to the best of my recollection it was about $1.25 per acre). Said purchase was made with the money of Mr. John H. Kirby, and the deed taken from said J. B. Wallace to Mr. J. N. Votaw, thus leaving a balance due upon said tract of land to the state of Texas, which said balance also was afterwards paid by said John H. Kirby.

"Some time during the latter part of the year 1899 I purchased H. T. & B. section No. 4, in Hardin county, Tex., from J. B. Wallace, taking the deed therefor in the name of Mr. J. N. Votaw for the use and benefit of Mr. John H. Kirby, paying therefor, to the best of my recollection, $1.25 per acre; said payment being made in cash; said cash furnished by Mr. John H. Kirby and paid to the said J. B. Wallace by me. I did take a deed from the said J. B. Wallace to the vendee above mentioned, but I cannot positively remember the date of the deed any further than that it was some time in 1899, and that said deed was taken in the name of Mr. J. N. Votaw, but for the use and benefit of Mr. John H. Kirby.

"Some time during the latter part of 1899 I did take a deed from J. B. Wallace to Mr. J. N. Votaw to H. T. & B. section No. 4, situated in Hardin county, Tex.; said deed being taken in the name of J. N. Votaw, as a precaution that other landowners from whom I desired to make additional purchases might not suspect that Mr. John H. Kirby was in the market making extensive land purchases in that territory. Mr. J. N. Votaw did not pay the purchase money of said tract of land covered by the deed from J. B. Wallace, nor any part thereof, but said consideration was wholly paid by Mr. John H. Kirby.

"I knew about the transaction of the purchase of H. T. & B. R. R. Co. section No. 4, in Hardin county, Tex., from J. B. Wallace, because I made said purchase from said J. B. Wallace, taking the deed therefor in the name of Mr. J. N. Votaw, for the use and benefit of Mr. John H. Kirby, who paid the entire consideration; the deed being taken in the name of Mr. J. N. Votaw for the reason heretofore stated that Mr. Kirby's name as the active purchaser of lands in that locality might not be disclosed to the public.

"I know who furnished the money which constituted the consideration paid to J. B. Wallace in the purchase from him of H. T. & B. section No. 4 in Hardin county, Tex.

"Mr. John H. Kirby furnished the money which constituted the consideration for said conveyance.

"The money was furnished by Mr. John H. Kirby because he was purchasing said H. T. & B. section No. 4 from J. B. Wallace, but for convenience the conveyance was taken in the name of Mr. J. N. Votaw.

"Mr. John H. Kirby furnished the money with which said payment of $37.44 was made to the state of Texas, in the name of Mr. J. N. Votaw, applying as an interest payment on the H. T. & B. Ry. Co. section No. 4, in Hardin county, Tex., originally purchased from the state of Texas in the name of J. B. Wallace.

"Mr. John H. Kirby furnished the said amount of $37.44 with which to pay said interest payment because he was the owner of the land in question and the real party in interest.

"The balance due the state of Texas by J. B. Wallace and subsequently by Mr. John H. Kirby on H. T. & B. section No. 4 in Hardin county, Tex., was not paid by Mr. J. N. Votaw, but it was paid by Mr. John H. Kirby, the owner of said section of land.

"The interest due the state of Texas on said section of land was always paid by Mr. John H.

Kirby through some agent in Austin before the principal sum itself was paid, and neither said interest nor the principal sum was paid by Mr. J. N. Votaw, but by Mr. John H. Kirby.

"I know who furnished the money to pay the balance due the state of Texas on H. T. & B. section No. 4, in Hardin county, Tex.; both the interest and principal due the state of Texas were paid by Mr. John H. Kirby.

"I purchased for Mr. John H. Kirby H. & T. C. R. R. Co. section No. 224, Hardin county, Tex., some time during the year 1900, making the purchase thereof in the name of Mr. J. N. Votaw and paying therefor with the money of Mr. John H. Kirby.

"Some time during the year 1900 I purchased for the use and benefit of Mr. John H. Kirby H. & T. C. section No. 224, situated in Hardin county, Tex., making the purchase thereof for the use and benefit of Mr. John H. Kirby, and paying therefor with his money.

"Some time during the year 1900, I caused Mr. J. N. Votaw to purchase H. & T. C. section No. 224, situated in Hardin county, Tex., he making the application therefor for the use and benefit of Mr. John H. Kirby, I paying the state of Texas the required payment out of money belonging to Mr. John H. Kirby. I made said purchase in the name of Mr. J. N. Votaw for reasons heretofore set out in preceding answers, in order that the public might not know that Mr. Kirby was in the market actively buying lands in said vicinity.

"Mr. J. N. Votaw did not pay anything to the state of Texas on account of the purchase of H. & T. C. section No. 224, in Hardin county, Tex., but all payments therefor were made by Mr. John H. Kirby.

"Mr. J. N. Votaw was not purchasing said land for himself, but purchased the same for the use and benefit of Mr. John H. Kirby, who paid all considerations for said lands to the state.

"Mr. John H. Kirby paid the various sums, principal and interest, paid to the state of Texas in the purchase of H. & T. C. section No. 224, Hardin county, Tex.

"Mr. J. N. Votaw made the application in his own name for the purchase of H. & T. C. section No. 224, in Hardin county, Tex.; but he made it for the use and benefit of Mr. John H. Kirby. Mr. J. N. Votaw did not pay the principal nor the interest required in the purchase of said tract of land; said money being all paid by Mr. John H. Kirby.

"I know who furnished the money with which to pay the $16, being the first payment due the state of Texas in the purchase of H. & T. C. Ry. Co. section No. 224, public free school lands, in Hardin county, Tex. Mr. John H. Kirby furnished the said $16.

"Mr. John H. Kirby furnished the said $16 payment to the state of Texas because he was the owner of said H. & T. C. Ry. Co. section No. 224.

"Interrogatory No. 36: Receipt No. 4–10954 from the treasurer's office of the state of Texas, signed by John W. Robbins, treasurer, and bearing date January 2, 1901, recites that the state of Texas received from M. E. Groos, on account of J. N. Votaw, the sum of $3.64, the same being interest to November 1, 1900, on account of the purchase of H. & T. C. Railway section No. 224, Hardin county, Tex. Please state whether or not you know who furnished the money with which said payment of $3.64 was made.

"A. I know who furnished the said $3.64. Mr. John H. Kirby furnished the $3.64 with which said payment was made.

"Mr. John H. Kirby furnished the $3.64 aforesaid simply because he was the owner of the tract of land upon which it was required and paid.

"Mr. John H. Kirby furnished the $18.72 which was paid to the state of Texas on ac-count of interest to November 1, 1901, upon said H. & T. C. No. 224. Mr. Kirby furnished said money simply because he was the owner of the land upon which it was required and paid by him.

"Mr. John H. Kirby made the final payment of the entire balance due the state of Texas, required to patent out H. & T. C. Ry. Co. section No. 224, situated in Hardin county; Mr. Kirby paying therefor with his own money. Said payment was not made with money belonging to Mr. J. N. Votaw, or to any other person other than said John H. Kirby.

"Mr. John H. Kirby furnished the money with which to pay the final payment due the state of Texas as principal and interest on H. & T. C. section No. 224, situated in Hardin county, Tex."

Cross-interrogatories by Kirby Lumber Company:

"I am a son of J. N. Votaw, the plaintiff in this cause. It is true that I resided in Texas until about January 1, 1907. I think I left Texas in the month of May or June, 1907.

"It is a fact that beginning with about the year 1898, and terminating some time in the year 1904, I had an agreement with Mr. John H. Kirby by which I purchased for him many tracts of land situated in Hardin and other counties in Texas, he furnishing the money to pay for said lands.

"It is true that between January 1, 1898, and February 1, 1904, I was engaged in purchasing lands in Hardin county and other counties in Texas for John H. Kirby, and in some instances for John H. Kirby and myself jointly, during which period I also made many purchases on my own account.

"It is a fact that during the year 1900 I purchased for Mr. John H. Kirby H. & T. C. section No. 224, in Hardin county, from the state of Texas, and caused the application therefor to the state of Texas to be made by and in the name of Mr. J. N. Votaw, who I understand is the plaintiff in this case, and that said land was awarded to the said J. N. Votaw, and that the preliminary payment of purchase money to the state of Texas, as well as all other subsequent payments, both principal and interest, were made by me out of funds belonging to the said Mr. John H. Kirby.

"It is true that Mr. J. N. Votaw did apply to the state of Texas to purchase H. & T. C. section 224 nominally for himself, but actually for the use and benefit of John H. Kirby, and that all sums of money paid in this connection—both principal and interest—for the purchase of said land were paid by me out of money belonging to Mr. John H. Kirby, and not out of money belonging to Mr. J. N. Votaw.

"It is true that I purchased for Mr. John H. Kirby from J. B. Wallace, of Hardin county, Tex., H. T. & B. section No. 4, situated in said county, and that the purchase price therefor was paid to said Wallace out of money belonging to Mr. John H. Kirby, and that the title thereto from said Wallace was taken in the name of Mr. John N. Votaw, by my direction.

"It is true that Mr. J. N. Votaw did not purchase, for himself H. T. & B. section No. 4, in Hardin county, Tex., but that I caused the deed therefor to be taken in his name, but for the use and benefit of Mr. John H. Kirby, and that I paid the consideration to said Wallace out of money furnished me by Mr. John H. Kirby for said purpose; and according to my request said Wallace conveyed the land to Mr. J. N. Votaw.

"It is a fact that each and every sum of money which was paid to the state of Texas and to J. B. Wallace as part or all of the purchase price of H. T. & B. section No. 4 was paid by me out of funds furnished me by Mr. John H. Kirby for said purpose.

"It is not true that Mr. J. N. Votaw purchased for himself H. T. & B. section No. 4, but it is true that the deed thereto was taken in his name, but for the use and benefit of Mr. John H. Kirby, and that he purchased the same at my request for Mr. John H. Kirby..

"It is not true that Mr. J. N. Votaw purchased for himself H. & T. C. section No. 224, situated in Hardin county, Tex., but it is true that the title thereto was taken in the name of said Mr. J. N. Votaw, but for the use and benefit of John H. Kirby, and that all payments made on account of said section of land were made out of funds belonging to John H. Kirby.

"It is a fact that I purchased a number of tracts of land for John H. Kirby and took deeds therefor in the name of J. N. Votaw, and that he afterwards conveyed all of those tracts of land requested by me to the person whom I designated.

"In a number of cases, in purchasing lands for John H. Kirby, I took conveyances in the name of J. N. Votaw, and he, the said J. N. Votaw, afterwards executed conveyances therefor, embracing all of the tracts of land which I requested him so to do.

"J. N. Votaw is a lawyer by profession. I employed J. N. Votaw, on behalf of John H. Kirby, to pass upon the titles to certain lands which were being acquired by John H. Kirby, and on his behalf, and as an incident thereto certain of said titles were taken in the name of J. N. Votaw.

"J. N. Votaw did examine a number of titles to lands which I purchased for John H. Kirby (I do not now recall any titles examined by him which were purchased for John H. Kirby and myself jointly), and I think, perhaps, he may have and very likely did represent Mr. John H. Kirby or some of his companies in certain land litigation in Hardin county, Tex.; but he never officiated, at my request, in the negotiation for the purchase of any lands whatsoever. For all of his services I can state that Mr. J. N. Votaw was paid most liberally. I know that he received for his services over $15,000, and that the same was paid in cash by me.

"I do know that John H. Kirby never employed Mr. J. N. Votaw to pass upon the titles to the lands which I acquired for Mr. Kirby; that employment was effected by myself. Mr. J. N. Votaw only passed upon certain titles and had nothing to do with the acquisition of any lands for Mr. Kirby that I know anything about, and for his services the said J. N. Votaw was compensated as more fully explained by me in my preceding answer.

"J. N. Votaw did not purchase any lands for John H. Kirby, but titles were taken in his name to a number of tracts of land in Hardin county, Tex. (and perhaps in other counties I do not now remember), for the use and benefit of Mr. John H. Kirby, but with the exception of H. T. & B. section No. 4, and H. & T. C. section No. 224, and a portion of the Napoleon De Waltz survey, which I now recall to memory, it would be manifestly impossible for me at this late date to give further details.

"I have no deed or deeds in my possession from J. N. Votaw to any person conveying H. & T. C. section No. 225, and H. T. & B. section No. 4, situated in Hardin county, Tex., or either of them; consequently am unable to attach said deed and unable to say whether or not I have ever seen such deed or deeds.

"Cross-interrogatory No. 19: Is it not a fact that, when John H. Kirby and C. M. Votaw jointly and individually sold said lands to the Houston Oil Company of Texas, J. N. Votaw conveyed H. & T. C. section 224 or H. T. & B. section 4, or both of them, to the said Houston Oil Company of Texas, or to yourself, or John H. Kirby? Please answer fully and in detail. If you say that you have seen such a deed, please state where such deed is now, before whom acknowledged, the date thereof, giving full description thereof.

"A. I cannot answer this interrogatory positively either in the affirmative or negative, but, to the best of my knowledge and belief, Mr. J. N. Votaw did execute deeds covering both H. & T. C. section No. 224 and H. T. & B. section No. 4, situated in Hardin county, Tex.

"I was land commissioner for the Houston Oil Company of Texas from the date of its incorporation up to and for some time subsequent to the date it went into the hands of receivers.

"I do not know positively whether I have ever seen a deed from Mr. J. N. Votaw to any person for either H. & T. C. section No. 224, or H. T. & B. section No. 4, in Hardin county, Tex.

"I did write a letter to Mr. John H. Kirby (directed, however, to his cashier, Mr. E. J. Eyres), said letter bearing date of August 18, 1900, with reference to H. T. & B. section No. 4, in Hardin county, Tex., and the purchase thereof from Mr. J. B. Wallace. I do not know where the original of said letter is at the present time, but I have a true and perfect copy thereof in my possession, which I attach to my answers hereto, and on the back of which I have placed the following notation: 'Identified by me and referred to in my answers to depositions in the two cases of J. N. Votaw v. Houston Oil Company of Texas et al. in the district court of Hardin county."

Cross-interrogatory by plaintiff:

"I went to San Domingo in the year 1907, and my business has been continually that of lumber and timber."

The following receipts from the treasurer's office were offered in evidence:

"Treasurer's office receipt No. D–10941, dated January 2, 1901, showing payment of $32.50 as interest money on H. & T. B. section No. 4, in Hardin county, Tex., said receipt being issued to M. E. Groos for account J. B. Wallace, January 2, 1901.

"Treasurer's office receipt No. D–4026 to J. T. Smith for account J. N. Votaw, November 8, 1901, showing payment of $37.44 as interest money on H. T. & B. section No. 4, in Hardin county, Tex.

"Treasurer's office receipt No. D–22199, dated February 19, 1902, to H. G. King for account J. N. Votaw, same being full interest and principal on account of purchase of section 4, H. T. & B. section, in Hardin county, Tex.

"Treasurer's office receipt No. 20448 to M. E. Groos for account J. N. Votaw, dated October 10, 1900, same being first payment on section 224, H. & T. C. public free school lands, situated in Hardin county, Tex. Said receipt is for the sum of $16.

"Treasurer's office receipt No. D–10954, dated January 2, 1901, to M. E. Groos for account of J. N. Votaw, showing payment of $3.64 as interest money on H. & T. C. section No. 224, situated in Hardin county, Tex."

"Treasurer's office receipt No. D–13783, dated December 19, 1901, to M. E. Groos for account of J. N. Votaw, showing payment of $18.72 as interest money on H. & T. C. section 224, situated in Hardin county, Tex.

"Treasurer's office receipt No. D–22194, dated February 19, 1902, to H. G. King, for account of J. N. Votaw, showing payment of full interest and principal due the state of Texas on account of purchase of section 224, H. & T. C., in Hardin county, Tex.

"Original award card, dated March 7, 1900, showing that J. D. Wallace was awarded section 4, H. & T. C. Ry. Co. in Hardin county, Tex., signed by Charles Rogan, commissioner of the general land office.

"Original card, dated June 10, 1901, from Charles Rogan, Commissioner of the General Land Office, acknowledging receipt of transfer from J. B. Wallace to J. N. Votaw of H. T. & B. section 4, certificate 561, in Hardin county, Tex.

"Original award card, dated September 20, 1900, showing that J. N. Votaw was awarded section 224, H. & T. C. Ry. Co. in Hardin county, Tex., signed by Charles Rogan, commissioner of the general land office"

—also deed from John H. Kirby to W. W. Willson, dated May 10, 1901, filed for record and recorded on May 11, 1901, conveying said two sections of land, and deed from W. W. Willson to John H. Kirby, dated July 8, 1901, and acknowledged and filed for record on October 8, 1909, to both of said sections, were read in evidence; also deed from John H. Kirby to Houston Oil Company of Texas, dated March 25, 1902, filed for record October 9, 1903, to both of said sections, and deed from John H. Kirby to Houston Oil Company of Texas, dated September 29, 1903, and acknowledged and filed for record March 1, 1906, conveying both sections, were read in evidence.

Defendants read in evidence certificate from the office of the comptroller of the state of Texas as follows:

"Comptroller's Office, Austin, Texas.

"I, H. B. Terrell, comptroller of public accounts of the state of Texas, do hereby certify that the following is a true and correct statement of the assessments for taxation of the Abst. 800, cert. 508, Sur. 224, J. N. Votaw (H. & T. C.) survey of land, situated in Hardin county, Tex., for the years, in the manner and quantity herein stated, as shown for the records of this office:

| Year | To Whom Assessed | Acres | Where Assessed. |
|------|------------------|-------|-----------------|
| 1902 | Houston Oil Co. | 640 | Hardin Co. |
| 1903 | " " " | 640 | " " |
| 1904 | " " " | 640 | " " |
| 1905 | " " " | 640 | " " |
| 1906 | " " " | 640 | " " |
| 1907 | " " " | 640 | " " |
| 1908 | " " " | 640 | " " |
| 1909 | " " " | 640 | " " |
| 1910 | " " " | 640 | " " |
| 1911 | " " " | 640 | " " |
| 1912 | " " " | 640 | " " |
| 1913 | " " " | 640 | " " |
| 1914 | " " " | 640 | " " |

"In testimony whereof I hereunto sign my name officially and cause the seal of this office to be impressed hereon on this the 8th day of July, A. D. 1915.
"L. W. Little, Acting Comptroller."

—also the following certificate:

"Comptroller's Office, Austin, Texas.

"I, H. B. Terrell, comptroller of public accounts of the state of Texas, do hereby certify that the following is a true and correct statement of the assessments for taxation of the Abst. 751, Cert. 561, Sur. 4, J. B. Wallace (H. T. & B,) survey of land, situated in Hardin county, Tex., for the years, in the manner and quantity herein stated, as shown for the records of this office:

| Year | To Whom Assessed | Acres | Where Assessed. |
|------|------------------|-------|-----------------|
| 1902 | Houston Oil Co. | 640 | |
| 1903 | " " " | 640 | |
| 1904 | " " " | 640 | |
| 1905 | " " " | 640 | |
| 1906 | " " " | 640 | |
| 1907 | " " " | 640 | |
| 1908 | Unknown Owner | 640 | |
| 1909 | Houston Oil Co. | 640 | |
| 1910 | " " " | 640 | |
| 1911 | " " " | 640 | |
| 1912 | " " " | 640 | |
| 1913 | " " " | 640 | |
| 1914 | " " " | 640 | |

"In testimony whereof I hereunto sign my name officially and cause the seal of this office to be impressed hereon on this the 8th day of July, A. D. 1915.
"L. W. Little, Acting Comptroller."

Defendants also offered the following tax receipts: Tax receipt for the year 1901, showing payment by W. W. Willson of the taxes on both tracts of land involved in this suit; tax receipt for the years 1902 and 1903, showing payment by the Houston Oil Company of the taxes on both surveys involved in this suit; tax receipt for the year 1904, showing payment of taxes on both surveys in this suit by Charles Dillingham and F. A. Reichardt, receivers for the Houston Oil Company of Texas; tax receipt for the year 1905, showing payment of taxes on both surveys in this suit by Charles Dillingham and F. A. Reichardt, receivers for the Houston Oil Company of Texas; tax receipts for the years 1906 and 1907 and 1908 showing payment of taxes on both surveys in this suit by Charles Dillingham and F. A. Reichardt, receivers for the Houston Oil Company of Texas; tax receipts for the years 1909, 1910, 1911, 1912, 1913, and 1914, showing payment of taxes on both surveys in this suit, by the Houston Oil Company of Texas.

The testimony of W. W. Dies is as follows:

"My name is W. W. Dies. * * * I knew J. B. Wallace very well. He is dead now. During the time I knew him he lived here in Kountze, and he was the agent for the Texas & New Orleans Railroad Company. I remember the transaction wherein I took his acknowledgment to a deed conveying H. T. & B. section No. 4, in this county; remember it very well. What I did in that transaction was at the instance of Mr. C. M. Votaw. I negotiated the trade, and I don't know whether Mr. Votaw ever saw Mr. Wallace personally or not. I know there are two Votaws, and my testimony refers to C. M. Votaw. I talked with Mr. Wallace several times with reference to the purchase of the land, and he didn't want to sell it. He was somewhat of a dreamer, and he had an idea that this land would be worth a great deal more than it will be, but he needed some money, and I talked to his wife about it. She had more sense than he had and better judgment in business, too, and she thought he ought to sell it, and finally he agreed to sell it, and did sell it. I know who was the real purchaser of the land; know just what Clark Votaw told me about it.

I had had considerable business transactions with Clark Votaw along about that time, and I assisted in the purchase of a great many tracts of land over the country, and in this transaction particularly. Clark Votaw asked me to see Wallace about it, knowing that we were good friends. Clark Votaw was acting for Mr. Kirby —John H. Kirby. Clark Votaw told me that he was acting for Kirby, and Mr. Kirby also told me, but I don't think either was present when the other told me that; neither was J. N. Votaw present when I was told that. Clark told me why he bought it that way. He said, 'If I buy it for Kirby, some fellow will want more for his land.' Kirby was reputed to be very wealthy. That was the reason for taking the title in various parties. Votaw was a pretty sharp fellow, and knew how to do most anything along that line. I don't know just how Mr. Wallace was paid for section 4, but my recollection is that Clark Votaw sent me a draft to make the payment with; don't know whether he paid all at one time, but it seems like he paid part at one time and part another time. The draft he sent me was drawn on E. J. Eyres, of Houston. Clark used to draw drafts on him all the time, and I drew a few on him myself. Mr. Eyres was Mr. Kirby's man Friday or handy man; am not saying that in disparagement of Mr. Eyres, but in a spirit of fun. I don't remember now whether I sent the deed that Wallace executed with draft attached, or whether I sent it direct to Mr. Eyres or to Mr. Votaw; one or the other. To my knowledge, Mr. J. N. Votaw, the father of Clark Votaw, and the plaintiff in this case, had nothing to do with the purchase of this land from Wallace. I did not know J. N. Votaw in the transaction. My understanding was that Mr. Votaw passed on titles for Mr. Kirby. I got that understanding from Clark; don't know whether I ever talked to Judge Votaw about it or not."

On cross-examination:

"I was not particularly representing C. M. Votaw when I made the purchase, but he come to me and wanted my assistance. I don't remember whether he paid me a fee for making the purchase or not. We used to be good friends. It was not a very easy thing to buy the land from Mr. Wallace, because he had his ideas about what the future value of the land would be. I could not be sure whether C. M. Votaw paid a part of the consideration for the land or not. I think when I got the deed that I sent it to C. M. Votaw. I don't remember how much I paid an acre for the land. He had bought it from the state, and he owed the state some on it, and I presume the part that he owed the state was a part of the consideration for the deed. I don't know whether he owed the state $^{39}/_{40}$ of the total consideration or not; don't remember exactly what he owed the state. He bought the land on 40 years I think, and when Votaw bought the land from Wallace I presume he assumed the balance due the state. I don't remember exactly how much cash was paid to Wallace at the time he executed the deed. It has been fifteen years ago, and I have no interest in the case. I don't think that I was employed as the agent of Clark M. Votaw, nor did he pay me a fee; don't think he did. I had a pretty hard time making the trade with Wallace; had to go to his wife about it, but I didn't persuade her to make the sale. I was very intimate with the family. Mr. Votaw couldn't make the trade himself, and he got me to make it. I told Wallace that it was a good sale. I thought so at the time, and think so yet. I didn't try to exercise any undue influence over them. I just wanted to buy the stuff for Mr. Votaw, or rather Mr. Kirby. If you say that Wallace was getting $1.25 per acre, I presume that is so, but I don't remember exactly the amount involved; that is my best recollection. I couldn't say from my own recollection I agreed to pay Wallace for the land, nor how much was due to the state. I presume what Wallace owed the state was a part of the consideration, but don't know about it. I suppose that is so."

Defendants also introduced in evidence the following letter:

"Mr. E. J. Eyres, Houston, Texas—My dear Mr. Eyres: Yours of yesterday, inclosing copies of, and memoranda of contracts, just received, and I beg to thank you for your kindness and trouble in the matter but was sorry to know that you were not feeling well; trust you will take a rest to-morrow and feel better Monday.

"I return you the abstract and deed to the C. C. Lund 320 acres, which you sent me from which I get descriptions, as we have a duplicate abstract in this office, having made them all that way.

"I was just on the point of letting you know what I was doing when your request came in, viz.:

"To-day I closed for the John Jianes undivided 500 acres in a 640 shown on map, near center of the county (this is properly John Iiams) at $1.00 per acre, but with a little extra in the way of trimmings, and of such a nature that I will have to explain them in a personal interview only. I also made a payment of $79 on 306 acres of the Wiley G. Powell 640 at $1.50 per acre, plus a bonus of $72.95 to Will Cruse, which made it cheap notwithstanding at a little less than $1.75 per acre.

"I also closed a contract with J. B. Wallace for H. T. & B. section No. 4, 640 acres, which you will find located adjoining the N. W. corner of the James Scott league, at a net price of $672.00, plus a small commission I will have to pay Will Dies, as this man wanted $5 per acre when I first went to him. Please see if the P. & M. Bank has his deed made to J. N. V. or C. G. Bruce, and with instructions to hold until October 5th for balance of money, which should be $552, and I will ask you to wire me about this Monday morning so that I will know it is safe to pay the $150.00 draft I told him to draw on me, and which is at the bank here, and which I want to do Monday.

"Mr. Bruce has bought the John W. Clayton 640, and 700 acres of the Adelia Yocum league from George W. Davis estate at $2.00 per acre, and which will necessitate a payment of $260, and which are good tracts of land, and quite cheap at that price.

"Mr. Bruce has been working for a long time on the James Scott league, and can now buy the north ⅔ of it (the S. ⅓ is no good) at $2.62½ per acre. We have bought better land at half, but there is a good profit even at this price, and you can see at a glance its advantageous position on the map, in the way of making connections between purchases made.

"It will take a payment of about $700 to manage it, but we will get about the 1st of November to close the balance in. I hope you can manage the down payment.

"J. C. League has two sections of B. B. B. & C. lands (sections No. 43 and No. 44) which are extra good, having about 5,000 feet per acre on them, which Mr. Bruce can buy at $2.25, and I would be glad that you could manage the ¹/₁₀ payment on them in a few days also, as they are cheap, and it has taken much hard work to get him to the point we now have him.

"I inclose you herewith receipt or contract from W. W. Cruse to the 306 acres of the W. G. Powell, and I also inclose you the recorded will of R. F. Clements, deed from Clements heirs to J. B. Hooks, and deed J. B. Hooks to J. N. Votaw, who will deed to Mr. Kirby Monday, thanks for the blank deeds you sent us to-day, and of which we were not only out, but none in town.

"Very sincerely yours,     C. M. Votaw.

"Yes; I drew on you to-day in these matters $250.00 and $100.00; total $350.00."

Said E. J. Eyres testified as follows:

"At the time I received that letter Mr. Kirby was not in the state of Texas; he was in Boston at that time. I don't know how long he remained in Boston on that occasion, haven't looked that up, but think he left here some time in May of that year. He left some time in May, I think, and got back some time in September, I think, of that year. I can look at my letter book, and it will probably refresh my memory on that point. (Witness then examines his letter book.) This book shows that he left Houston on May 29, 1900, and returned—was in Houston—on September 1, 1900. During the year 1900 Mr. Kirby's time was just about equally divided in and out of the state; that is usually the case. During the times that Mr. Kirby would be out of the state Mr. C. M. Votaw would take up with me the matter of purchasing the lands, their desirability and price, and so forth. And when he would buy a piece of land he would draw on me for the money; he would draw on me indiscriminately. Some of the times he would report to me when he would buy the land, and sometimes he would just draw and then tell me about it afterwards. I did not have a thing to do with the details of the purchase; that is, the manner in which the purchase was made. I know that it has developed in the testimony that Mr. C. M. Votaw caused the application for section 224, H. & T. C., to be made by Mr. J. N. Votaw, but I don't think I knew anything about that. I had a general knowledge that titles were taken in the name of four or five different people, but don't think I knew anything about that particular transaction. Some titles were taken in the name of C. M. Votaw, and in the name of J. N. Votaw and Charles G. Bruce, and probably one or two others. I know, generally speaking, that it was Mr. Clark Votaw's practice to take titles in other people's names. Whenever any land was bought from parties that had bought from the state, and payments were to be made to the state, those matters were generally handled through Mr. H. G. King, of Austin, Tex. The majority of them were handled by him. However, that was all attended to by Mr. Clark Votaw. I know that the two sections of land involved in this suit have been handled by me and carried by as Mr. Kirby's land."

On cross-examination:

"I don't think I could give you any estimate of the amount of land acquired in the manner I have described in the year 1901, but during the year 1900 I think Mr. Kirby acquired something like 50,000 acres in that manner. I couldn't state what proportion of that was Texas school land. I didn't testify in the recent suit at Austin, never testified in any suit at Austin, wherein the state was suing to recover certain sections of land. I didn't go there in person, but I think that I testified by deposition; I don't remember; there are so many details in the office that I don't try to keep up with them. I think my depositions were verbal, and were taken in the courthouse at Houston, when I come to think about it. I presume they were reduced to writing and signed by me and sent to Austin and used in that case. Don't remember what I swore in that case; can't remember if I swore that each of the purchases that were made by individuals were made in good faith by those people, and then afterwards acquired by Mr. Kirby; don't remember if I swore it, but, if I swore it, I did not know it to be a fact. I don't remember that I denied that the land was bought in the name of other people for the benefit of Mr. Kirby. I don't remember how long ago it has been since I gave my testimony in that case, but think it was last year some time. The land that Votaw bought was taken in the name of various people, but it was for the use and benefit of John H. Kirby. Some was taken in the name of J. N. Votaw, and some in C. M. Votaw and Charles G. Bruce, and probably one or two others. I don't remember whether a large proportion of those lands were school lands or not; I had no information about that, because all the details were handled by Mr. Votaw. I didn't pass on that part of it. I passed on the price and the desirability of it. I don't think that I passed on each tract—not all of them, but on most of them. I couldn't tell anything about the land, and the way I passed on it I had to rely on Mr. Votaw for my information. I am strictly an office man. I also passed on the situation of the land and the amount of timber on it. I didn't know at the time we were buying from whom we were buying. I didn't know whether the land was being bought from the state through dummies, or from individuals through dummies. I kept myself in the dark on those subjects because had no reason to do anything else.

"Q. I will ask you this direct question: Isn't it a fact that a very large proportion of those lands purchased in 1900 were bought from the land commissioner at Austin, as state school land? A. I don't remember; I don't know anything about that.

"I don't remember what my testimony was on that point when I was testifying at Houston by deposition to be used in the state case at Austin. I couldn't testify to anything I didn't know, so I guess I testified then that I didn't know anything about it.

"I know that the two tracts of land in litigation here were carried on Mr. Kirby's books as belonging to him. Those books are in Houston, and the reason I didn't bring the books with me was because I had no call for them.

"I have owned some land in this section of the country and own some now. I own some of the Mary Hopkins survey in this county—4 or 5 acres in that. It is supposed to be oil land, and I own 21 acres in section ———; don't remember the number; either 341 or 348 W. C. Ry., I think. That is in Hardin county. I think that is all I own in Hardin county.

"I own a bunch of land in Shelby county, but I don't know what they are, though I have bought land from the state for myself, but couldn't say; don't remember. I don't remember the year, I made application for so many tracts of land. Some I have got, and some I haven't got. I don't know whether I ever got any land awarded to me in behalf of John H. Kirby. I have got a very bad memory; have to write everything down. All of our land records were burned up in the federal court fire in Houston, so there is no way to refresh my memory. It is a blank as to how many sections I bought from the state for myself and how many I bought from the state for Kirby, if I ever bought any for him.

"If I bought section 210, certificate 502, for 640 acres in Hardin county, I don't remember it. I never put on the list of assets; don't think I ever made a list of assets. I never did render it for taxes either. If I ever owned it, I don't remember it. If I ever bought section 212, certificate 504, 640 acres in Hardin county, I don't remember either. I couldn't say how far back I can remember anything; some things I remember a good while, and other things I forget right away. I have an awful memory, and have to write everything down. I don't call that a convenient memory; I call it a darn bad memory, if the court will excuse the expression.

"I don't remember anything about section 220, certificate 505, Hardin county, either; don't remember anything about it. I couldn't say how much I paid for those three sections in Hardin county, because I don't remember anything about them. If I filed on section 246, certificate 820, 640 acres of land, I don't remember anything about that either; remember absolutely nothing about it. In applying for the purchase of those lands, if the form is that I swore that I was the sole party interested in the purchase thereof; I guess I swore to it, if I applied for the purchase of them. If that is

the form used, and if I applied for the land, I guess I used that form and swore to it. I couldn't say as a matter of fact that I was the only party interested in the purchase of that land, because I don't remember anything about it.

"I did not state that land that was worth $6,-400 would be such a small matter that it wouldn't impress me; but my memory is so bad that I can't remember a thing unless I have something to remember it by.

"I am a married man, but I couldn't tell you the year I got married. I married in Shreveport, but I don't remember what year. I remember my wife's name, and remember what her father's name was. I remember that I have no children. I don't remember the name of the preacher that married us, but I remember that it was done in Shreveport. Remember that it was in some church, but don't remember what church. I remember that when we went away that night she slept in one end of the Pullman and I slept in the other.

"I don't know anything about section 2, certificate 492; don't know whether it was originally applied for in the name of W. W. Dies or not. I don't remember whether I purchased section 50, certificate 34/87, which was originally purchased by W. W. Dies and patented to me—don't remember whether that was purchased for Mr. Kirby or for me.

"Q. If you had, in fact, purchased for yourself approximately 4,000 acres of land in this county and acquired the patents on the 6th and 7th of March and paid the state the consideration therefor in cash, you think you wouldn't remember it? A. I couldn't say. I have had so many deals that I can't remember anything about any of them. I have to write them down, and if I haven't a record I am lost. I don't know whether I bought every one of the tracts of land which have been enumerated here for the benefit of John H. Kirby and paid his money for them; can't remember about that.

"I knew a man in New York named James Irvine during his lifetime. He is now dead. I do not remember of buying a piece of land in San Augustine county known as the Kellogg survey, and immediately thereafter transferring it to said James Irvine; don't remember anything about it. I don't think that James Irvine was one of the men that sometimes took title in his name for the benefit of Kirby. If he did, I don't remember it. If James Irvine shortly after the time you speak of transferred the land to Kirby, I don't remember it; I may have prepared the deed, but, if I did, I don't remember it.

"I am 51 years of age; I remember that. I believe I have been interested with Clark Votaw in some of his land deals, but I don't remember just what it was. I was not interested with him, to my knowledge, when he, as land commissioner for the Houston Oil Company, conveyed approximately 14,000 acres of land to the Houston Oil Company, and they did not record the deeds, and subsequently conveyed that same land, with the deeds not recorded, to the Thompson-Ford Lumber Company and the Kelley Lumber Company. I know nothing about that, and never heard about it that I know of. I don't know anything about any litigation between the Thompson-Ford Lumber Company and the Kelley Lumber Company recently over that land; I am not connected with either of them, and know nothing about it.

"Q. The case is a case styled Houston Oil Company of Texas v. Thompson-Ford Lumber Company et al. It was originally tried before the special master in Houston; heard by Judge Burns on an issue as to whether the Thompson-Ford Lumber Company was a purchaser in good faith for value from Clark M. Votaw of about 14,000 acres of land which he had previously sold when land commissioner to the Houston Oil Company, and wherein the judgment of the court at Houston was against the Thompson-Ford Company, and that company appealed to the United States Circuit Court of Appeals at New Orleans, and about two or three months ago that judgment was affirmed, the effect of which was to declare the title in the Houston Oil Company to these lands which Clark Votaw had sold a second time to the Kelley Lumber Company. Do you know anything about that?

"A. Don't remember anything about it, but may have heard the case mentioned; that is all. It may have affected the Kirby Lumber Company, but I am not with the Kirby Lumber Company, I am with John H. Kirby. As his chief clerk, I do not handle any of the business of the Kirby Lumber Company; have nothing to do with that. They have got a manager and assistant general manager, and heads for every department, and, if I would butt in, I would be very promptly called down by the head of the department. The only information I get about the company drifts to me in conversations I have with them. It is a fact that Mr. Kirby devotes a large part of his time to the business of the lumber company—to the finances of it. But I, as chief clerk, do not handle any of the business of the lumber company.

"I said awhile ago that I might have heard of some such suit as you mentioned, but I don't remember any of the details, just the style of the case. Don't know anything of the transaction by which Clark Votaw sold that land the second time. Don't remember whether I was interested in or got any of the proceeds of the sale. Clark Votaw and I were very close about that time; just about as close as two men working on the same thing get together; we were very intimate. I didn't know anything about him holding those deeds off the records while he was the land commissioner for the Houston Oil Company; didn't ask him anything about it, it was his business. I don't know anything about him holding them off, except your statement here that he did it.

"I remember what salary Mr. Kirby pays me, but don't remember what salary he has been paying me for all these years. It has been raised from time to time, but couldn't tell you when or how much. I remember that I started in at $50 a month, but don't remember how long I worked for that much. I remember what street I live on. It is Mt. Vernon avenue, No. 3618. Remember my telephone number is Hadley 584. Don't remember the size of my shoes, and think I wear either 7 or 7⅛ hat. I am wearing a Panama hat; bought it from Kiam about 30 days ago; paid something like $5 or $6 for it. I remember what bank I do business with—the Union National. My office is on the top floor of the First National; has no number, because we have all the offices on the top floor.

"I think Mr. Kirby has been president of the Kirby Lumber Company ever since it was first organized; think he has been president continuously. I am sure that he knew this case was set for to-day, because Mr. Logue is his lawyer and he keeps him posted. He left Houston last Friday night. He is frequently in Beaumont. He was in Beaumont on the 4th and 5th of July. Don't know whether he frequently sees Judge Votaw there or not. You will have to ask him that. He never mentions it to me."

Defendants read in evidence certificate from the land office showing that H. & T. C. section 224 was detached land at the time it was sold, as follows:

"Austin, July 9, 1915.

"I, J. H. Walker, chief clerk and acting commissioner of the general land office of the state of Texas, do hereby certify that the papers, documents, and records of said office show:

"That on August 21, 1900, J. N. Votaw filed in said office his application and obligation to purchase section 224, certificate 508, H. & T. C.

Ry. Co., 640 acres, in Hardin county, as detached land, and said land was awarded the said J. N. Votaw August 21, 1900, on said application and obligation.

"That at the date of the filing of said application and obligation the said section 224, certificate 508, H. & T. C. Ry. Co., in said county, was shown by the records of said office to be isolated and detached from other public lands, and that same was then upon the market for sale as such.

"In testimony whereof I hereunto set my hand and affix the impress of the seal of said office on the day and date first above written.

"[Signed]    J. H. Walker,
"Acting Commissioner."

Defendants read in evidence the same character of certificate in reference to H. T. & B. section 4, as follows:

"Austin, July 9, 1915.

"I, J. H. Walker, chief clerk and acting commissioner of the general land office of the state of Texas, do hereby certify that the papers, documents, and records of said office show:

"That on December 18, 1899, J. B. Wallace filed in said office his application and obligation to purchase section 4, certificate 561, H. T. & B. Ry. Co., 640 acres, in Hardin county, as detached land.

"That at the date of filing of said application and obligation said section 4, according to the records of said office, was isolated and detached from other public lands, and same was then upon the market for sale as such.

"In testimony whereof I hereunto set my hand and affix the impress of the seal of said office on the day and date first above written.

"[Signed]    J. H. Walker,
"Acting Commissioner."

Defendants read in evidence the depositions of John H. Kirby, as follows:

"I reside in Houston, Harris county, Tex. I hold the position of president of the Kirby Lumber Company at the present time, and have held such position since the organization of the company in 1901.

"I am acquainted with the market value of merchantable pine timber or trees, also lumber manufactured therefrom at the present time and during the year 1913 in the vicinity of section 224, in Hardin county, as inquired about. During the year 1913 the market value of pine timber in that neighborhood was probably about $2 per 1,000 feet, though the condition of the lumber market in that period probably made it doubtful whether pine stumpage had any value at all; that is, there was no profit in manufacturing it, even though the stumpage were donated or obtained without cost. The value of the manufactured product of trees growing in the neighborhood inquired about and of the character which grew on section 224 averaged around $10 per 1,000 feet. The upper grades of lumber sold for more and the lower grades for less; the average being about $10 for that character of timber. The average logging cost at our mill in that territory was $6.64, and the average manufacturing cost was $4.32, so that there was an actual loss in operations without allowing anything for stumpage.

"The Kirby Lumber Company has a contract with the Houston Oil Company of Texas to purchase merchantable pine timber or trees on all the land owned by the Houston Oil Company of Texas in Texas and Louisiana. Said contract has been in existence since 1901, and the prices range from $3 per thousand to $5 per thousand flat, without interest, taxes, or other charges. The contract provides that the Kirby Lumber Company shall pay certain fixed semiannual installments in case, and during the year 1913 these installments were paid, though the timber cut by the Kirby Lumber Company

at $5 per 1,000 was less than the total amount of the payments made. For bookkeeping purposes the timber is valued as scaled at $5 per 1,000 during the entire cutting period, and the price will be the same in 1920 as in 1913. The contract does not specifically mention section 224. * * * Permission was extended the Kirby Lumber Company to cut the timber, and the Kirby Lumber Company, as I am informed, did so cut the timber.

"I am informed that the Kirby Lumber Company did cause the merchantable pine trees standing on section 224 here inquired about to be cut, that permission to make such cutting was granted by the Houston Oil Company, and that the timber was cut for account of the Houston Oil Company and as the property of the Houston Oil Company. The Houston Oil Company rendered to the Kirby Lumber Company a statement showing that there had been cut from section 224 a total of 2,950,033 feet.

"I have already answered that the market valute of timber in this neighborhood in 1913 was about $2 per M feet, notwithstanding the fact that there was no profit in the manufacture of it at any price for stumpage. Sawmill men are an optimistic lot of jackasses who, in order to keep their mills going and their men employed, will lose money in the hope that the future market for their product will enable them to recover the loss.

"I have already answered that the market value of lumber manufactured from the kind of trees that grew upon this land in the year 1913 was about an average of $10 per thousand.

"I have already answered that I had no personal knowledge of the quantity of timber cut from this section of land or the actual cutting, but that the records of the Kirby Lumber Company show that the timber was cut, and that the Houston Oil Company, which scales the logs, presented an itemized scale of same showing the amount heretofore testified about.

"There was no specific payment for this timber. It was cut under the general contract, and the average amount received by the Houston Oil Company under that contract and paid by us is $2.61½ per thousand. This would be the cash value of present payments at $5 per M during the cutting period specified under the contract. This price $2.61½ is the average price of all timber involved in the contract, whereas most of the timber covered by the contract is much superior to section 224 located in the flat lands of Hardin county, and where the timber is inferior and the product, that is, the lumber made therefrom, of low grade.

"I have already testified that the average value of lumber made from timber of this character in 1913 was about $10 per M feet which was the average amount realized therefor by the Kirby Lumber Company, and I think the Kirby Lumber Company got all that the lumber would sell for in the market. It was our effort to do so, and I think we did so.

"It is not a fact that the Kirby Lumber Company will not sell any of its timber holdings at $5 per M feet; on the contrary, the Kirby Lumber Company owns timber that it would be glad to sell at $2 per M feet, whereas it owns other timber needed for the operation of its mills that it could not afford to sell at $5 per M or even more, unless the purchaser would take the mill."

The testimony showed that appellants' attorneys advised the Kirby Lumber Company to cut the timber. Said counsel testified:

"I think that Clark Votaw and John H. Kirby are on friendly terms. I only know what Mr. Kirby said with reference to whether or not he had any stock in Clark Votaw's San Domingo corporation; think somebody asked him if he didn't have some stock in Votaw's company down there, and my recollection is that he said

he did. At the present time Mr. H. M. Richter is the land commissioner of the Houston Oil Company and keeps the title papers of the company. When I was land commissioner, I think I had charge of them. I got them after Mr. Votaw went out; think I went in there probably two years after he did."

It was agreed by counsel that the two sections in controversy were inventoried by the receivers of the Houston Oil Company of Texas, by the United States Circuit Court at Houston, as part of the assets of the Houston Oil Company. This is limited to the question of good faith in cutting the timber.

The appellee, in rebuttal, offered in evidence a certified copy of the original application to purchase section 224, H. & T. C., in Hardin county, Tex., dated August 20, 1900, which said application is as follows:

"Beaumont, Texas, Aug. 20, 1900.
"To Hon. Charles Rogan, Commissioner General Land Office:

"I hereby apply to purchase, under the provisions of 'An act to provide for the sale of all lands, heretofore or hereafter surveyed and set apart for the public free schools, and the several asylums, and the lease of such lands and of the public lands of the state, and the patenting of any of said lands for church, cemetery or schoolhouse sites, and to prevent the free use, occupancy, unlawful inclosure, or unlawful appropriation of such lands, and to prescribe and provide adequate penalties therefor,' as provided for in title LXXXVII, chapter twelve A, of the Revised Civil Statutes of 1885, and the amendments thereto by the act of May 19, 1897, the following lands situated in Hardin county, Tex., about —— miles (give course) —— from county site, agreeing to pay for same at price specified below.

| Section. | Township. | Certificate. | Grantee. | Acres. | Price Pr. A. | Classification. |
|---|---|---|---|---|---|---|
| 224 | | 508 | H. & T. C. Ry. Co. | 640 | | Grazing |

"For the purpose of securing the said land and complying with the law regulating the sale of the same, I hereby make and subscribe to the following oath, to wit.:

"I, J. N. Votaw, do solemnly swear that I am buying this said land for my own use, and not for any other person or corporation, and that said land is not occupied by any one; that my post office address is Beaumont, in Jefferson county, state of Texas.
"[Signed] J. N. Votaw, Applicant.

"Subscribed and sworn to before me, this 20 day of Aug. A. D. 1900. F. N. Votaw, Notary Public in and for Jefferson County, Texas. [Seal.]

"Obligation.
"$624.00.　　　School Lands.
"For value received, I, the undersigned, do promise to pay to the state of Texas the sum of six hundred and twenty-four dollars, with interest thereon as hereinafter specified, the same being for the balance of the purchase money for the following described tract of land purchased by me this day of the state of Texas in accordance with the provisions of 'An act to provide for the sale of all lands heretofore or hereafter surveyed and set apart for the benefit of the public free schools, and the several asylums, and the lease of said lands and of the public lands of the state, and the patenting of any part of said lands for church, cemetery or

184 S.W.—42

schoolhouse sites, and to prevent the free use, occupancy, unlawful inclosure or unlawful appropriation of such lands, and to prescribe adequate penalties therefor,' as provided for in title LXXXVII, chapter twelve A, of the Revised Civil Statutes of 1895, and the amendments thereto by the act of May 19, 1897, to wit: All of section 224, block ——, township ——, in Hardin county, surveyed for the school fund by virtue of certificate No. 508, issued to the H. & T. C. Ry. Co.

"The annual interest of 3 per cent. upon all unpaid principal, together with one-fortieth of the original principal, I am to pay or cause to be paid to the state treasurer at Austin, Travis county, Tex., on or before the first day of each November thereafter until the whole purchase money is paid. And it is expressly understood that I am to comply strictly with all the conditions, limitations, and requirements, and am subject to, and accept all the penalties contained and prescribed in the above-recited act.
"Witness my hand this 20th day of August, A. D. 1900.　　　　　　J. N. Votaw."

The appellee testified for himself as follows:

"I didn't hear what Judge Dies testified to, but I was told that he testified as to having purchased this land, and my son also, by deposition, testified to having purchased it, and I want to say this: Of course, two facts can't disagree, and, as a matter of fact, I went to Wallace when he was living just across the railroad from the hotel, early in the morning. I remember that he had been gathering up fertilizer that had been left by the cattle, and throwing it in his garden. My attention has been called to this land being a detached section 'and to the character of it by my son, C. M. Votaw. We were filing on quite considerable land along about that time, both individually and for him and myself jointly, and it was our understanding— He had a great many thousand dollars in his possession that belonged to me, and this land was bought for my benefit—this section 4, as well as section 224. But I am now speaking of the purchase of this section 4 from Mr. Wallace, and my son's purpose was to make the payments out of the funds that he had in his possession, quite a number of thousands of dollars.

"Q. Do you mean funds that he had of yours? A. Yes, sir. I say that he had a good many of thousands of dollars that belonged to me, and still has, for that matter. I made the purchase from Mr. Wallace while he was engaged as I have stated, and I think it was before he had breakfast that morning, and I bargained with him there for the land. Then I reported that to my son, who by virtue of a partnership that existed between he and I beginning on the 1st of January, 1899—he had all of the title papers, and he was to look after the details of everything, both personally and jointly, while I was confined in the office. I made the purchase in that way though I wasn't present when the deed was made. That was what he did, anyway, in the purchase of the land. As a rule, he attended to the details and I attended to the legal matters entirely, and this land was purchased as usual, but it was purchased absolutely for me. Kirby's name was never mentioned, and it was never the intention at the time of the purchase on the part of my son; don't believe he had Kirby in his mind at all. And I know that I had no suspicion in the world at that time that anybody would ever claim the land but me prior to me having made a sale of it. Those are the facts, and by a little investigation it could be found by the existence of other facts. They all harmonize, because they are the facts.

"This paper you hand me is the application I made to purchase section 224, and that is my affidavit thereon, and that affidavit is true. I

never have sworn what wasn't true, and I am not going to begin now. I purchased the land on that blank application. I was going to say we had written up in our office a lot of applications on the typewriter, but I am quite sure these were purchased by regular blanks furnished me by the land office. They required me to make that affidavit before they would award the land to me.

"C. M. Votaw had possession of all my title papers and my private land papers; that was when he was living at Houston.

"There was a card introduced in evidence yesterday in which it was shown that the patent to one or both of these sections was delivered to Mr. King. I remember very distinctly that I met him in Clark's [C. M. Votaw] office in Houston, and I then requested Mr. King to receive the patent from the land office, and my son was to send the money to take up the patents, and I suppose he did it, because that was customary between him and I, and I no more doubted him than I did the course of the planets. I mean C. M. Votaw. I had all the confidence in the world in him. I was in the land office some time myself last year. I personally signed the authority to King to receive the patents, and that authority is on file there in the land office.

"I never did consent to act as trustee for John H. Kirby for either of these tracts of land; they were bought for me absolutely. I supposed my son was looking after these tracts, as well as my other land, for me, in my interest. He had all of my title papers, and acted as my agent absolutely. He was authorized to do it, and I expected him to do it."

The court, after hearing the above evidence, filed his findings of fact and conclusions of law as follows:

"(1) On the 17th day of August, 1900, on a written form furnished to him by the commissioner of the general land office of Texas, the plaintiff, J. N. Votaw, made his application to purchase detached school section No. 224, certificate No. 508, issued to H. & T. C. Ry. Co., abstract No. 800, and located in Hardin county. That said application was made on the blank printed form furnished by said commissioner of the general land office, and it had a blank printed form of affidavit and a blank printed form of obligation to the state as a part of the application to purchase. These blanks were all filled out in writing and the affidavit required signed and sworn to by applicant, the plaintiff, before a notary public of Jefferson county, on the day of its date. The affidavit made by applicant (plaintiff) stated that he applied to purchase said section of school land for himself, and for no other person nor for any corporation.

"(2) This affidavit was a regulation previously made and existing at the time by the commissioner of the general land office for the sale of detached school sections under the Revised Statutes of 1895, as amended by the act of 1897, and plaintiff had been previous to this informed by said commissioner of the general land office that sales of detached school lands would not be made without the making of said affidavit by the applicants. That plaintiff, J. N. Votaw, executed the blank obligation attached as a part of the application by properly filling in the blanks for the sum of $624, payable to the state in 40 equal annual payments, and bearing 3 per cent. interest per annum. Said application, affidavit, and obligation, together with the first payment at $1 per acre, which was $16, was all mailed on the same day by plaintiff to the commissioner of the general land office as provided by law, who in a few days duly accepted same and duly awarded said tract of land to the applicant, J. N. Votaw.

"(3) That, all deferred payments having been made by Jno. H. Kirby, the state of Texas, acting by the commissioner of the general land office and the Governor of Texas, did on the 7th day of March, 1902, issue a patent to plaintiff, J. N. Votaw, for said section 224, certificate 508, H. & T. C. Ry. Co. survey.

"(4) That on the day of the 7th of March, 1900, J. B. Wallace, on the same kind of printed blank as used by J. N. Votaw, applied to the commissioner of the general land office to purchase under the same law and regulations detached school section No. 4, certificate 800, issued to H. T. & B. Ry. Co., abstract No. 751, at $2 per acre, accompanying his application with the first payment $32, first having properly filled out the blank affidavit and the blank obligation to the state of Texas for the sum of $1,248, payable in 40 equal annual installments, and bearing 3 per cent. interest per annum. The form of application and affidavit being the same as that of J. N. Votaw for section 224, mentioned in paragraph 3 hereof. That said affidavit was duly sworn to by the said J. B. Wallace, and the commissioner of the general land office duly awarded said section to the said J. B. Wallace, the applicant, to purchase same.

"(4) That by deed of conveyance dated August 17, 1900, which was executed and duly acknowledged by the grantor, J. B. Wallace, the latter conveyed to said J. N. Votaw plaintiff herein, said section 4, certificate No. 800, abstract 751, H. T. & B. Ry. Co. survey.

"(5) That said deed of conveyance was forthwith recorded in Volume Y, page 387, of the Deed Records of Hardin County, and thereafter during the year 1900 the said deed was duly filed in the office of the commissioner of the general land office of Texas.

"(6) That on March 7, 1902, the state of Texas, acting by and through the commissioner of the general land office and the Governor of Texas, issued to J. N. Votaw, plaintiff, assignee of J. B. Wallace (all deferred payments having been made, by John H. Kirby), a patent bearing said date for said section 4, certificate 800, issued to H. T. & B. Ry. Co.

"(7) The defendants, except the Maryland Trust Company, have a consecutive chain of transfers from John H. Kirby to W. W. Willson (the former having conveyed both of said sections, No. 224 and No. 4, to W. W. Willson on May 10, 1901, who on August 10, 1901, reconveyed to John H. Kirby) down to and in the Houston Oil Company of Texas, the date of Mr. Kirby's deed to the Houston Oil Company of Texas section 224 being dated March 25, 1902, and Kirby's deed to the same corporation for section 4 being dated September 29, 1901. These deeds were duly recorded in 1902 in the Deed Records of Hardin County, but neither of defendants connects itself by conveyance or title to either of the tracts of land sued for with the state of Texas nor from or out of plaintiff, J. N. Votaw.

"(8) The evidence shows that John H. Kirby's money was used in paying for both sections, and not plaintiff's money, which was a fraud on plaintiff, all of which was unknown to plaintiff and never ratified by him.

"(9) He also shows by his evidence that whenever he made an extra good trade Kirby paid him a part of the profits.

"(10) That at the time of the purchase from the state of section 224, and from J. B. Wallace of section 4, for several years thereafter C. M. Votaw was the partner of John H. Kirby in the purchase and sale of lands. That Kirby paid him a salary and also gave him a part of the profits when he made an extra good trade. That the purchaser of both sections of land sued for got an extra good trade at the time of their purchase in 1900.

"(11) That from the year 1899 and for years thereafter C. M. Votaw had custody of all the deeds and other instruments affecting title to

lands of his father, J. N. Votaw, plaintiff, who relied on him to look after his land matters.

"(12) That at the time of the purchase of section 224 from the state, and section 4 from J. B. Wallace by J. N. Votaw, but claimed by C. M. Votaw to be for John H. Kirby, C. M. Votaw was the agent for J. N. Votaw in the purchase of lands, and he relied on him to protect his interests.

"(13) That several days previous to purchase of section 4 J. N. Votaw had a conversation with J. B. Wallace in which the latter agreed to sell to him section 4, and a day or so later C. M. Votaw, who had several thousand dollars of plaintiff's money on hand for use in the purchase for plaintiff of lands, was instructed by plaintiff to buy for him section 4 from Wallace. That Wallace did convey this section to plaintiff. That, if C. M. Votaw did not use plaintiff's money to buy both sections, including the deferred payments on each, he has never returned any of it to plaintiff.

"(14) That J. B. Wallace died in 1901. That both of the sections of land herein sued for with the timber thereon were worth in 1913 from $16 to $25 per acre, and were worth the same when this suit was filed less the value of the timber cut from the sections.

"(15) That neither John H. Kirby nor any one else ever obligated himself or themselves in writing or otherwise to pay the state of Texas the sums of money for which J. N. Votaw and J. B. Wallace obligated themselves to pay the state of Texas for the two sections of land sued for, but it was understood as a part of the consideration for section 4 that J. N. Votaw, to whom he made a deed, was to pay the sum owing by Wallace to the state.

"(16) The two sections of land are and always have been wild, uncultivated, and unused lands, except for about six weeks when defendants were occupying it cutting timber. The Kirby Tie & Timber Company occupied 224 a part of the time in 1902 in cutting several thousand ties.

"(17) That at the time of nor previous to the cutting of the timber from section 224 and the ties from section 4 did either of the defendants examine the deed records of Hardin county nor the records of the general land office to ascertain that the title to both or seek his consent to do the cutting. They relied only on the statement of Kirby to the effect that J. N. Votaw was holding the land in trust for him. Kirby's depositions were taken in the case, but he did not testify that J. N. Votaw held the land in trust for him. He was silent on the point.

"(18) I find that plaintiff, J. N. Votaw, never agreed or consented to hold either of said tracts of land in trust for John H. Kirby or any other or any corporation.

"(19) I find that John H. Kirby nor any person for him ever made either in writing or orally any contract or agreement to pay the state of Texas or J. B. Wallace any obligation or debt of the latter or of J. N. Votaw.

"(20) I find all the purported evidence attempting to show that J. N. Votaw purchased or held the two sections of land sued for or either of them in trust is not clear, nor satisfactory, but is insufficient, and that the purported trust is too remote, as it could have, if valid, existed for 40 years.

"(21) I find that the plaintiff has and owns the legal and equitable title to both the sections of land sued for; that the Kirby Lumber Company and the Houston Oil Company of Texas, beginning in September, 1913, and ending December 31, 1913, wrongfully and illegally cut and removed from said section 224 merchantable pine trees or timber, aggregating 2,950,000 feet, log measure of the market value of $2.50 per 1,000 feet, and from section 4 236 hardwood ties of the admitted value of 10 cents per tie at the time of the removal, and that plaintiff has been damaged by the said acts of the defendants, in-

cluding 6 per cent. interest thereon from January 1, 1914, $8,080.70.

"(22) That the trees after they were made into logs from section 224, and delivered at the mill of the Kirby Lumber Company at Fuqua, were of the market and cost value of $6.60 per 1,000 feet, and that said logs were made into merchantable lumber, containing the same number of feet at the same place and time, which was worth $10 per 1,000 feet.

### Conclusions of Law.

"(1) The defendants showed no title to either of the tracts of land sued for; the evidence being insufficient to establish that plaintiff held either of said tracts of land in trust for John H. Kirby or any other person or any corporation.

"(2) The plaintiff having shown both a legal and equitable title in himself, and while so owing it, the defendants wrongfully cut and removed timber therefrom September, 1913, to the 31st day of December, 1913, of the value as stated in the foregoing statement of facts, which, with 6 per cent. interest from January 1, 1915, to the present time, makes $8,083.70, plaintiff is entitled to a judgment for the title and possession of both tracts of land sued for against all these defendants and all costs incurred, and for judgment against the Houston Oil Company of Texas and the Kirby Lumber Company for the sum of $8,083.70, and that plaintiff have his writ of possession for said land, and execution for the sums mentioned against defendants liable therefor. Judgment has been entered accordingly."

Appellants by the first assignment of error challenge the judgment of the lower court, and say that the same is contrary to law and the undisputed facts in the case, for that, regardless of any other fact, it was established beyond cavil that the funds of John H. Kirby, the immediate vendor of the defendant Houston Oil Company of Texas, were appropriated and used to pay, and did pay, the total and entire consideration which was paid for each and every conveyance and title to the plaintiff, J. N. Votaw, of H. & T. C. section 224, in Hardin county, Tex., and that the said J. N. Votaw never at any time paid any consideration whatever for said land, from which naked fact alone resulting there arose and existed in favor of said John H. Kirby to said land an equitable title to said land, and thereby became vested in John H. Kirby and passed to and was and is vested in defendant Houston Oil Company of Texas, for which reason the judgment should have been that plaintiff take nothing as to said defendant Houston Oil Company of Texas as to said land, and that he take nothing against defendants for damages for timber cut therefrom.

Revised Statutes 1895, arts. 4218J, 4218K, provide:

"Art. 4218j. All sales shall be made by the commissioner of the general land office, or under his direction, and he shall prescribe suitable regulations whereby all purchasers shall be required to reside upon as a home the land purchased by them for three consecutive years next succeeding the date of their purchase, except when otherwise provided. Such regulations shall require the purchaser to reside upon the land for three consecutive years herein mentioned, and to make proper proof of such residence and occupancy to the commissioner of the general land office within two years next after the ex-

piration of said three years, by his affidavit, corroborated by the affidavits of three disinterested and credible persons, to be certified by some officer authorized to administer oaths, and on making such proof the commissioner shall issue to the purchaser, his heirs and assigns, a certificate showing that fact. If, however, any purchaser has sold his purchase, or any part thereof. his vendee shall be permitted to compute the time of the occupancy of his vendor as a part of his own occupancy; and if any person has sold the whole or any part of his purchase under this or any former law, his vendee, or if he refuses to do so, the vendor himself, may make proof of occupancy as provided herein. Any person desiring to purchase land in accordance with the provisions of this chapter shall forward his application to the commissioner, describing the land sought to be purchased, which application shall be accompanied with the affidavit of the applicant, in effect that he desires to purchase the land for a home, and has in good faith settled thereon, except where otherwise provided herein, and he shall also swear that he is not acting in collusion with others for the purpose of buying the land for any other person or corporation, and that no other person or corporation is interested in the purchase thereof. Any owner of land heretofore purchased, and which land has been or may be forfeited for nonpayment of interest, shall have ninety days prior right after this chapter goes into effect, or after the land is again placed upon the market, to purchase said land without the condition of settlement and occupancy, in case it has been occupied for three consecutive years as required by law; but if not, then he shall reside thereon until the occupancy under the first and last purchase shall together amount to said term of three years: Provided, that when any forfeiture has been made the commissioner of the general land office shall add to the appraised value of such land the amount of interest due thereon, at the time of forfeiture, which shall be paid in cash with the first payment of one-fortieth of the appraised value of the land when purchased under the preference right to purchase given herein. Any original purchaser or his vendee of any of the lands the sale of which is provided for in this chapter, who has improved such land as a home, and who has been forced to temporarily abandon the same on account of drouth, and who shall in good faith reoccupy the same, either by themselves or vendees, within six months after this chapter goes into effect, shall not have the forfeiture declared against them under the law providing for the forfeiture of such lands for nonoccupancy: Provided, that they shall make affidavit, supported by the affidavit of three disinterested witnesses, that they have reoccupied the land as a home in good faith, and that they had abandoned the same since their purchase on account of the drouth and not otherwise; and such absence shall not be deducted from the three years occupancy required by law in making final proof of occupancy: And provided further, that any purchasers or their vendees of such lands who have failed to make proof of occupancy as required by the law regulating such purchases shall have six months after this chapter shall take effect to make such proof of occupancy as required by the provisions of this chapter. The purchaser shall transmit to the treasurer of the state one-fortieth of the aggregate purchase money for the particular tract of land, and send to the commissioner his obligation to the state, duly executed, binding the purchaser to pay to the state on the first day of November of each year thereafter, until the whole purchase money is paid, one-fortieth of the aggregate price, with interest at the rate of three per cent. per annum on the whole unpaid purchase money, which interest shall also be payable on the first day of November of each year; and upon receipt of one-fortieth of the purchase money by the treas-

urer, and the affidavit and obligation aforesaid by the commissioner, the sale shall be deemed and held effective from the date the affidavit and obligation are filed in the general land office: Provided, that if the land applied for be timbered land, then the purchaser shall be required to pay the full amount of the purchase money at the time of his purchase.

"Art. 4218k. Purchasers shall have the option of paying the purchase money for their lands in full at any time after they have occupied the same for three consecutive years; and when they have made such payment in full, together with the proof that they have occupied the land for three consecutive years, they shall receive patents for the same upon payment of the patent fee prescribed by law. Purchasers may also sell their lands, or a part of the same, in quantities of forty acres or multiples thereof, at any time after the sale is effected under this chapter, and in such cases the vendee, or any subsequent vendee, or his heirs or legatees, shall file his own obligation with the commissioner of the general land office, together with the duly authenticated conveyance or transfer from the original purchaser and the intermediate vendee's conveyance or transfer, if any there be, duly recorded in the county where the land lies or to which said county may be attached for judicial purposes, together with his affidavit, in case three years residence has not already been had upon said land and proof made of that fact, stating that he desires to purchase the land for a home, and that he has in good faith settled thereon, and that he has not acted in collusion with others for the purpose of buying the land for any other person or corporation, and that no other person or corporation is interested in the purchase, save himself, and thereupon the original obligation shall be surrendered or cancelled or properly credited, as the case may be, and the vendee shall become the purchaser direct from the state, and be subject to all the obligations and penalties prescribed by this chapter, and the original purchaser shall be absolved in whole or in part, as the case may be, from further liability thereon: Provided, that whenever a town shall be located and established upon any lands sold under this or any former chapter, the purchaser or his vendee shall be permitted to pay the entire balance of principal and interest due the state upon such land and obtain a patent therefor at any time, but no such payment shall be permitted or patent issued until such purchaser or owner of such land shall file in the general land office a certified plat of such town, made by a surveyor, which shall be accompanied by the affidavit of the owner of such land, corroborated by the affidavit of five disinterested and credible citizens of the county, to the effect that a town, giving its name, has been located and established upon the land, and that there has been erected therein, and is being occupied by bona fide citizens, twenty business and residence houses, or either, or both."

This statute was unchanged by the act of 1897, excepting that the latter act authorizes the commissioner to sell detached lands at not less than $1 per acre, without the condition of settlement.

[1] J. N. Votaw made the application provided under the statute, and also the oath provided therein, and the court found that he forwarded with the application to purchase section 224 the initial payment for same.

J. N. Votaw executed an obligation for the deferred payments in compliance with the law. J. B. Wallace, as to section 4, did likewise. Wallace then, by deed duly executed, conveyed to Votaw, which deed in, compli-

ance with the law, was first recorded in Hardin county, and then duly refiled in the general land office. Votaw received a patent as assignee of J. B. Wallace. There is no evidence in the record to show that John H. Kirby paid the initial payment for section 4, and neither did he obligate himself in writing, or otherwise, to pay the state of Texas the sums of money which J. N. Votaw and J. B. Wallace had obligated themselves to pay the state for said two sections, or agree in writing or orally to assume the said obligations to the state.

There are two theories with reference to the purchase of this land. Upon one theory it was purchased under an agreement made by C. M. Votaw as the agent or partner of John H. Kirby, with his father, J. N. Votaw, to the effect that his said father was to purchase, and did contract to purchase, this land from the state of Texas in his own name; that the funds of John H. Kirby were to be used in the purchase, and were, in fact, so used, but that the said purchase was to be made in reality for John H. Kirby; that, while the patents were issued to J. N. Votaw, the title was really to be held in trust for John H. Kirby. The other theory arises under the testimony of appellee himself, who testified that the purchase of the land and obligations entered into by him for said purchase to the state, and with reference to the J. B. Wallace land, were made by him in his own behalf, made in good faith, believed that his own money was paying for the land, and did not know or hear anything to the contrary until about the time this suit was filed, and that C. M. Votaw, his son, was his agent in the purchase of these two tracts of land, and that his said son had in his hands funds belonging to the said J. N. Votaw, money to the amount of many thousands of dollars, and that he believed the same was used in the purchase of the lands, and had no reason to think otherwise until, as above stated, about the time this suit was filed, and that a fraud was perpetrated by the said C. M. Votaw on his father and principal. We will examine whether under either of these two theories a trust would arise in favor of John H. Kirby.

First, with reference to the theory that C. M. Votaw obtained these lands by connivance with his father, and with his help, and using the said J. N. Votaw to make a false affidavit, and to do the other acts and things necessary to consummate the purchase from the state of Texas; also that the said C. M. Votaw used his said father to purchase from Wallace, and as such substitute purchaser obtained a patent from the state of Texas to himself for the use and benefit of John H. Kirby.

We have examined the multitude of authorities presented to us by appellants covering every conceivable branch of the case, and they have, indeed, exhausted the subject of resulting trusts, and we have also examined with care the authorities presented by the appellee.

In the case of Eastham v. Roundtree, 56 Tex. 110, Judge Stayton uses the following language:

"If this suit was between J. M. Roundtree and the administrator of Carothers' estate, and it appeared that the purchase was made with the money of J. M. Roundtree, and that the deed was taken in the name of Carothers with intent thereby to secrete the property, and thereby to hinder, delay, and defraud the creditors of J. M. Roundtree, there is no question that the deed would have to stand, not only because the statute makes such illegal acts binding between the parties, but for the further reason that the courts would not interfere to relieve a party from his own fraud. The main question in this case is: Do the same rules apply as between Irene Roundtree, the intended beneficiary, and the representative of the estate of Carothers, that would be applicable in a controversy about the property between such representative and J. M. Roundtree, notwithstanding that Irene Roundtree is, so far as the pleadings and proof show, entirely free from participation in any fraud whatever? We are of the opinion that the same rules must apply. The deed to the property was made to Carothers, and the title must be held to have passed, as appears upon the face of the deed, unless the intervener can show a resulting trust in her favor arising upon the fact that her father paid one-half of the purchase money therefor for her benefit, under circumstances *which make the transaction lawful.* [Italics ours.] If one-half of the purchase money was paid by the father under such circumstances as made such investment for the benefit of intervener fraudulent as to his creditors, then it is certainly true that all the claim she has is based upon a transaction illegal, because made to hinder, delay, and defraud creditors, and from which no resulting trust can spring in her favor, although she may not have participated in the fraud and may not have had any knowledge thereof; for in such case she appears as the intended donee of her father, through a transaction forbidden by law. To permit a man's children to recover property which he had fraudulently placed in the name of another for the purpose of placing it beyond the reach of his creditors, upon the ground that it was intended for their benefit, would be to contravene a well-settled public policy, and to offer a premium to dishonesty. *It is a universal rule that no one can claim a right through the fraud of himself or another. Ex turpi causa non oritur actio. No resulting trust can spring from an act contrary to public policy or a statute.* [Italics ours.]"

Continuing, the court says:

"In the case of Murphy v. Hubert, 16 Pa. (4 Harris) 56, which was much like the present in its facts, it was decided that no resulting trust could be raised through an act forbidden by law; that to raise such a trust the transaction upon which it was based must be honest. The rule and reasons for the same are well stated in the case above referred to. The rule is thus stated by an elementary writer: 'As a general rule, a contract or agreement cannot be made the subject of an action if it be impeachable on the ground of dishonesty, or as being opposed to public policy. If it be either contra bonos mores, or forbidden by the law. In answer to an action founded on such an agreement the maxim may be urged, "Ex maleficio non oritur actio." A contract cannot arise out of an act radically vicious and illegal; those who come into a court of justice to seek redress must come with clean hands, and must disclose a transaction warranted by law; and it is quite clear that a court of justice can give no suste-

nance to the enforcement of contracts which the law of the land has interdicted.' * * * Such being the principles applied to contracts, the rule loses nothing of its force when applied to a case in which a party seeks to base a right upon a presumption founded upon an act forbidden alike by good morals and the law of the land. The proposition contended for by the appellee, and sanctioned by the court below in the charges given and refused, is, in effect, that if J. M. Roundtree, with his own funds, paid one-half of the purchase money and had the deed made to Carothers with intent to defraud his creditors, that the courts of the country will permit proof of these facts to be made, and then presume and enforce a right growing out of the same in favor of the daughter. Such a proposition cannot be maintained."

A great elementary writer has the following to say:

"If a voluntary conveyance is made for some illegal or fraudulent purpose, whether it is common-law or a modern conveyance, no trust will result to the grantor, for the reason that the rules of law cannot be used, controlled or avoided by parties with the fraudulent intent to do that, indirectly, which they cannot do directly." 1 Perry on Trusts (6th Ed.) § 165, p. 257.

In the case of Miller et al. v. Davis, 50 Mo. 573, the court says:

"The facts stated in this petition are, substantially, that the defendant's father, under the laws of Congress, had entered all the 40-acre tracts of land he was entitled to enter, and, not being able to enter the 40 acres in dispute in his own name, made the entry in the name of his infant son, the defendant. The petition then alleges that the father sold and conveyed this 40 acres to the plaintiff, and" asked that the title be "divested out of the infant and invested in the plaintiffs."

Continuing, the court says:

"It is a well-settled principle of equity jurisprudence that in general, when one person pays the purchase money for land, and the title is conveyed to another, a trust results in favor of the party who paid for the land. But, where such purchase is made in fraud of an existing statute *and in evasion of its express provisions* [italics ours], no trust can result in favor of the party, who is guilty of the fraud. There is no pretense here that the plaintiffs are innocent purchasers. They make no such allegation in the petition. They occupy the precise relation to the defendant that was held by their assignor, and boldly assert that he, in order to obtain this tract of land from the United States, used the name of his infant son, because he could not make the entry in his own name, having already entered as many 40-acre tracts as he was entitled to by the laws of the United States. His act in making this entry was against public policy. Under the facts as stated in the petition, no trust resulted to the father; and as between him and his assignees and the son a court of equity cannot disturb the title."

In the case of Rogers v. Blackshear, 128 S. W. 938, it is said:

"The legal title was in A. C. Rogers by virtue of the patent. Appellee seeks to ingraft upon the legal title an equitable title in himself, arising out of agreements between himself and Mrs. Christion, and between himself and A. C. Rogers, whereby they were, for him, to settle upon and occupy the land for the three years required by law, and thus enable him to acquire a title as an actual settler. This he could not do, and no title would have ever issued to appellee upon the true facts as found and as shown by the undisputed evidence. It was only by perpetration of a *fraud upon the state, by false swearing* [italics ours], that appellee could have ever expected to procure a title to the land. The offer by the state was of a donation of 160 acres of land to every married man or head of a family who should settle upon it and actually occupy it for a home for the time required by law. It did not admit vicarious occupancy by any person other than the occupant or his assignee of the right acquired"—citing Cravens v. Brooke, 17 Tex. 273; Turner v. Ferguson, 58 Tex. 10; De Montel v. Speed, 53 Tex. 343; Burleson v. Durham, 46 Tex. 156; Calvert v. Ramsey, 59 Tex. 492.

In the case of Brown v. Brown, reported in 132 S. W. 887, it is said:

"Appellant, in assigning error to the court's peremptory charge, presents two contentions: First, that by virtue of the premises he had an equitable title to an undivided one-half interest in the land sued for; or, if not, that he was entitled to the specific performance of the contract sued upon. We think both contentions must be overruled. While ordinarily a bond for title, as appellant urges the contract to be, is such equitable title, as in this state will authorize a recovery for lands, the only way by which title to school lands can be secured is by an original or substitute purchase from the state, accompanied with actual settlement and continued occupancy. It is not contended that appellant at any time ever settled upon or occupied the lands in controversy as his home. His occupancy, if any, was merely incidental to his business as a member of a ranching firm with his brother, and to give the contract the legal effect insisted upon is, we think, to violate the spirit, if not the letter, of our school land law. Joe Brown, under the statute, was authorized to accept the transfer and make settlement and occupancy of the lands in controversy, but his only standing or right was that of a substitute purchaser. As such, he was required under the law to make, not only the familiar affidavit of settlement and occupancy, *but also to swear that he was buying the land for his home, and that he was not acting in collusion with others for the purpose of buying the land for any other person or corporation, and that no persons or corporations were interested in the purchase save himself.* [Italics ours.] Revised Statutes 1895, art. 4292. The contract therefore, assuming it to have been delivered and to have been made for the purpose insisted upon by appellant, contemplated, not only the acquisition of title by Charley Brown without the required settlement and occupancy, *but also perjury on the part of his brother, Joe Brown, and falls within that class of contracts that the courts uniformly refuse to enforce.* [Italics ours.] See Anderson v. Carkins, 135 U. S. 483 [10 Sup. Ct. 905, 34 L. Ed. 272]. * * *

"Appellant insists that no one but the state can raise the question of fraud, and that this court has upheld bonds for title, citing, among others, the leading cases of Logan v. Curry [95 Tex. 664] 69 S. W. 129; Underwood v. King [102 Tex. 561] 119 S. W. 298; Witcher v. Wiles [33 Tex. Civ. App. 69] 75 S. W. 889. We think the present case, however, distinguishable from those mentioned, in that the bond for title upheld in Witcher v. Wiles was executed after, and not, as here, at the time or before, the title had vested in the party sought to be charged. Its performance required nothing inconsistent with the affidavits necessary to be made under the school land law, and the decision in Logan v. Curry, we think, is without application. In the case last referred to an independent party sought to destroy the title of Logan because of alleged collusion between Logan and his vendor; but here a party is seeking the aid of the courts to enforce a collusive contract, which presents an altogether different question."

In the case of Perry v. Martin, 180 S. W. 1148, the court says:

"This testimony would show that whatever title was acquired by Martin to the land in controversy was acquired under an agreement to hold the same in trust for Perry, but the objection interposed was to the effect that the agreement throughout was illegal, and therefore the court should not give effect to it. It is clear that the agreement between Harper and Perry, assuming it to have been made as alleged, contemplated the acquisition by Perry of the title to school land without the required settlement and occupancy, and that, in violation of law, Harper should purchase land for the benefit of Perry *and make affidavit that he was not purchasing the same for any other person.* [Italics ours.] * * * The contracts alleged to have been made by the substitute purchasers succeeding said Harper are based upon the original illegal contract, and provide for carrying the same out in further disregard of the laws of the state. The courts will leave such parties to such collusive contracts in the position it finds them, and it must therefore be held that no error was committed in refusing to permit evidence of such contracts to be adduced."

We believe that the doctrine announced in the above cases is sound doctrine, and should be followed. We believe that equity follows the law, and that in a case like the present, if C. M. Votaw testified the truth with reference to these matters, no trust would arise and follow, even though the money of John H. Kirby was entirely used in the purchase of the land, under the circumstances as related by him.

[2] On the other hand, if J. N. Votaw speaks the truth, and the court found he did, the purchase was made by him, the affidavit was made in good faith by him, the money was in the hands of his son and his agent to pay for same, he says he knew nothing of John H. Kirby in the transaction, and had no reason to believe that the said Kirby had any interest in the transaction, but that both of these purchases were made by him for himself, and the court found that the first payment on section 224 accompanied the affidavit, and was made by the said J. N. Votaw. The said J. N. Votaw further testified that he himself bought section No. 4 H. T. & B. from Wallace; that he bought it for himself; that the remaining payments to the state of Texas were, as he believed, made with his money; at least that his said son, C. M. Votaw, had the funds necessary to make said payment in his hands and was acting as his agent in the matter, and looking after the same.

If, therefore, it can be said with any reasonable degree of certainty whose particular money was used in the purchase of Wallace land, whether J. N. Votaw's or John H. Kirby's, we do not believe that a trust would result from the facts as above given with reference to said section No. 4. There are reasons in the record more or less plausible from which it may be inferred that the testimony of C. M. Votaw on account of the friendly relations which seem to exist and which have existed between him and John H. Kirby, and the unfriendly relations which seem to exist between him and his father,

he being the only person perhaps that definitely knows whose money was used to make said purchases, which indicate that possibly he might be tempted to favor the one and be against the other in his statements with reference to said matter. At least the testimony which has been set out for that purpose shows uncertainty with reference to the matter of whose funds were used in both of said purchases, but, in view of the fact that the court found that J. N. Votaw was not a party to any connivance or illegal transaction or agreement by which he was to acquire said lands for John H. Kirby, and further found that the said J. N. Votaw forwarded the initial payment for section 224, H. & T. C., and that in the purchase of the Wallace land C. M. Votaw was the agent of J. N. Votaw, and that he relied on him to protect his interests, and that J. N. Votaw in fact and in truth bought the land himself from the said Wallace, and that his said son was instructed by him, said J. N. Votaw, to finish said purchase of said section 4, and in view of the further fact that Wallace did convey this section to plaintiff, all of which is amply sustained by the evidence, it would be reasonable to infer, inasmuch as C. M. Votaw did not return any of appellee's money, which he had on hand, that he used a part of same in the purchase of said land.

At any rate, as said before, the testimony is not clear, as it should be, in order to create a resulting trust, and is far from satisfactory to this court, as it seems to have been unsatisfactory to the court below. We are persuaded to believe that the court below was justified in his findings of fact, except with reference to John H. Kirby's money being used for the purchase of these two sections of land. To our minds, as above indicated, this is an exceedingly doubtful proposition.

Therefore we conclude that the action of the court below is correct in finding that the appellants showed no title to either of the trusts of land sued for, and that the evidence was insufficient to establish that appellee held either of said tracts in trust for John H. Kirby, or for any other person or corporation, and is correct in the further finding that the plaintiff showed both the legal and equitable title in himself, and, while so owning, the appellants wrongfully cut and removed the timber therefrom to the value of $8,083.70. We agree with appellants that under the facts in this case the judgment of the court below with reference to the value of the timber was correct, and the cross-assignments of appellee are overruled.

What has been said with reference to the first assignment covers, in our opinion, the entire case. Therefore the said first assignment of error and all the remaining assignments of appellants are overruled. It is the opinion of this court that there was no error in the judgment of the lower court, and that the same should be in all things affirmed.

It is so ordered.